2021 IL App (1st) 192576-U

No. 1-19-2576

Third Division
September 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 16 CR 8020 |
| v. | ) ) | The Honorable |
| GIOVANNI GARCIA, | ) ) | James Michael Obbish, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's convictions are affirmed, where: (1) many of the trial court's comments, although improper, did not prejudice the jury and deprive defendant of a fair trial; (2) the trial court properly denied defendant's motions for a directed verdict and for a new trial; (3) the trial court properly dismissed defendant's claims of ineffective assistance of counsel; and (4) the one-act, one-crime doctrine did not operate to bar defendant's conviction for attempted murder.

¶ 2    Following a jury trial, defendant Giovanni Garcia was convicted of one count of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and one count of attempted murder (720 ILCS 5/8-4(a) (West 2014)) and he was sentenced to 50 years and 26 years in the Illinois

Department of Corrections (IDOC), respectively, with the sentences to be served consecutively. On appeal, defendant raises a number of issues, including: (1) that the trial court's comments to defense counsel prejudiced the jury and deprived him of a fair trial, (2) that the State failed to prove him guilty beyond a reasonable doubt, (3) that the trial court erred in denying defendant a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), to evaluate his claims of ineffective assistance of counsel, and (4) that the trial court violated the one-act, one-crime doctrine by imposing sentences for two convictions that were based on the same act. For the reasons that follow, we affirm.

¶ 3                                    BACKGROUND

¶ 4        On April 8, 2016, victim Lauren Membreno was shot and killed while she was sitting with her boyfriend, Edwin Montano, in her motor vehicle, which was parked near Montano's home. On May 25, 2016, defendant was charged by indictment with six counts of first-degree murder of the victim, two counts of attempted murder of Montano, and two counts of aggravated discharge of a firearm; the State ultimately proceeded to trial on four counts of first-degree murder and two counts of attempted murder.

¶ 5        Defendant's jury trial was held on April 23-25, 2019; defendant was represented by three assistant public defenders (APDs), including APD Marijane Placek.[1] After the jury was seated, and prior to opening statements, APD Placek asked the trial court in front of the jury if she could approach the bench, and the court responded "[a]fter the opening statements." APD Placek then immediately informed the court that there was a witness present in the courtroom, and the court asked whose witness it was, as there was an order to exclude witnesses. APD

_____

[1] We name APD Placek specifically, because it is the trial court's comments to her that form the basis for several of defendant's arguments on appeal.

Placek explained that it was a defense witness, and asked the court to instruct the witness to return the next day, because the witness was under subpoena. The court continued the subpoena and ordered the witness to leave the courtroom.

¶ 6    The State called as its first witness Lucrecia Araiza, the victim's mother, who testified through a Spanish interpreter that the victim was 23 years old at the time of her death, that she lived with her mother, and that she was working as a manager at a Wendy's. Araiza further identified photos of the victim prior to the April 8, 2016, shooting and in the hospital after the shooting; the parties also stipulated as to a photo of the victim after her death. All of the photos were admitted into evidence.

¶ 7    On cross-examination, Araiza testified that Montano was the victim's boyfriend and that the victim was with him on the afternoon of the shooting. Montano was the person who informed her that the victim had been shot and was in the hospital. At the end of cross-examination, APD Placek concluded:

> "APD PLACEK: Thank you very much, ma'am, and I'm sorry for your loss.
>
> THE COURT: No more comments like that in the future, trying to engender any sympathy from the jury for yourself.
>
> APD PLACEK: No, Judge."

¶ 8    The State's next witness was Montano, who testified that he was 24 years old and had been in a relationship with the victim prior to her death. He was with the victim on April 8, 2016, and the two of them were "hanging out." They decided to purchase snacks, then watch movies at Montano's house. They drove in the victim's Volkswagen Beetle to a Jewel on 54th and Pulaski, which was approximately two blocks from Montano's house. The victim was driving, while Monanto was in the passenger's seat. They arrived at the Jewel at approximately 6:30

p.m. and the victim went inside the store while Montano waited in the vehicle in the Jewel parking lot.

¶ 9       While Montano was waiting for the victim, he observed three men exiting the store, including defendant; their presence drew Montano's attention because he had been in a "confrontation" with defendant previously. When Montano noticed the men, he became "anxious and nervous and a little scared because of what happened before," so he exited the vehicle to move to the driver's seat so that he could leave the area. However, after he exited the vehicle, he and defendant became engaged in an argument which involved calling each other names.[2] The argument did not turn physical and ended with the two "going [their] separate ways," with Montano returning to the passenger's seat of the victim's vehicle. Montano did not observe where defendant went, other than knowing that he went "[s]omewhere behind me," where other vehicles were parked in the parking lot.

¶ 10      After returning to the passenger's seat of the vehicle, Montano moved over to the driver's seat from inside the vehicle and drove to the front of the store to pick up the victim.[3] After picking up the victim, Montano continued driving and observed defendant and the other men in a silver Honda Civic or Accord and followed the vehicle in an attempt to obtain its license plate number. Montano testified that his intention was to call the police after he obtained the license plate number, but he was unable to obtain it, so he did not call the police. Montano did not continue following the vehicle but observed that it turned north on Pulaski.

---

[2] As we discuss in more detail below, it appears that Montano initiated the confrontation with defendant, who was walking by at the time that Montano exited the victim's vehicle.

[3] Although Montano did not specifically testify on the subject, we presume that the keys were left inside the vehicle when the victim exited it.

¶ 11    Montano drove towards his home and turned down Karlov, a one-way street. Montano parked on the left side of the street, approximately 20 yards from his home; the driver's side was facing the curb, while the passenger's side was facing the street. Montano and the victim did not exit the vehicle but remained inside, discussing their plans, for approximately 15 minutes while the victim smoked a cigarette. At the end of that time, Montano heard the sound of screeching brakes coming from the right, and he turned toward the direction of the sound. Montano observed the same silver Honda that he had observed earlier, and he observed defendant pointing a gun at him from the driver's seat of the vehicle. The Honda was slightly in front of the victim's vehicle, so Montano was able to observe defendant clearly through the front windshield of the victim's vehicle. Montano told the victim to duck, and he also ducked down. Montano heard a gunshot and glass shattering, then he observed the Honda continue down Karlov. Montano looked over and observed the victim with her head back and leaning towards the passenger-side window. He then ran to his house "to grab napkins and my charger so I can call the police"; Montano testified that his cell phone's battery was dying, so it needed to be charged. Montano testified that it took him 30 seconds to retrieve the items, then he placed towels on the victim's head and called the police from his cell phone.

¶ 12    When the police and ambulance arrived, the victim was placed on a stretcher and taken into the ambulance. Montano spoke with the police officers who came to the scene, and he informed them that "Gio" was the shooter and gave them his place of residence. Montano further informed the officers that he and defendant had been in an altercation earlier that day at the Jewel, and the officers took him back to the Jewel, where Montano viewed surveillance videos from the Jewel parking lot, and he showed the police where the victim's vehicle had been parked. After leaving the Jewel, Montano was taken to the police station, where he spoke

5

with detectives and an assistant State's Attorney. Montano testified that when he spoke to the officers at the scene, he again gave them defendant's name as the shooter, as well as the location of his home. Montano also told them that he knew defendant previously and showed them photographs of defendant that he had on his cell phone.

¶ 13    Montano testified that he knew defendant because he had purchased marijuana from him on two occasions at defendant's home. Montano stopped purchasing marijuana from defendant after defendant "shorted" him on a purchase. After that occasion, the next time Montano encountered defendant was on October 2, 2015, at a corner store. When he was leaving the store, Montano observed defendant and two other men following him. The men "beat [Montano] up," hitting him in the head with their fists. Montano was bruised on his face and head, and he contacted the police and told them that defendant was responsible for his injuries. Montano also took photos of defendant on his cell phone. Defendant and the other men left the area, and to Montano's knowledge, they were not arrested.

¶ 14    Montano also briefly encountered defendant on one other occasion. The victim had asked someone to bring her some Xanax pills, which were delivered to Montano's house. When Montano approached the vehicle to retrieve the pills, he observed defendant in the passenger's seat and left the area as the vehicle drove away. Montano did not contact the police.

¶ 15    Montano also identified a number of the State's exhibits, including (1) photos of the victim, (2) photos of the victim's vehicle after the shooting, (3) video of the crime scene after the shooting, and (4) photos that Montano had taken of defendant with his cell phone during their prior encounter in 2015. Montano also indicated on a map his route from the Jewel parking lot, as well as the direction defendant's vehicle turned. Finally, the parties stipulated to the

accuracy of the surveillance video from the Jewel parking lot, which was admitted into evidence, and Montano narrated what was depicted in the video as it was published to the jury.

¶ 16    The video, which is contained in the record on appeal, depicts the Jewel parking lot. Montano identified the victim's vehicle as a silver Volkswagen Beetle that is parked in the first parking spot on the lefthand side of the screen. At the beginning of the video, another silver vehicle pulls into the same row and parks in a just-vacated parking space two spaces from the Beetle; three individuals emerge from the vehicle and pass by the front of the Beetle before disappearing off-screen. Montano testified that he did not notice this vehicle or the individuals at that time. In a later section of the video, two men pass by the back of the Beetle; Montano identified one of the men as defendant and testified that he was carrying dry cleaning in his arms. Montano testified that this was the point at which he first noticed defendant's presence. Immediately after the men pass the vehicle, the video depicts an individual standing next to the passenger's side of the Beetle; Montano identified himself as that individual and testified that he was "[e]xchanging some words" with defendant. The video shows that Montano then leaves the side of the Beetle and walks toward defendant, who is continuing to walk in the same direction he was previously heading; the other man who was with defendant runs in another direction. Defendant then walks around the vehicle next to the Beetle, circling back towards the front of the parking lot, with Montano following him. Montano stops when he reaches the side of the Beetle and appears to enter the Beetle on the passenger's side, while defendant passes back to the parking lane, makes a gesture in Montano's direction, and walks toward the next line of vehicles; during this time, Montano testified that he was moving from the passenger's side to the driver's side inside the vehicle. Montano was asked whether he had any type of weapon during his verbal confrontation with defendant, and he testified that he had

7

an 18-inch "mini bat" tucked away in his pants, but that he did not ever show it to defendant or threaten him with it.

¶ 17        Shortly after Montano's confrontation with defendant, the video shows that the Beetle backs out of the parking spot, drives down the parking lane and goes offscreen, then reappears onscreen in the lane of traffic in front of the store. While the Beetle is offscreen, defendant walks toward the silver vehicle that had previously parked two spaces down from the Beetle and enters it. After the Beetle reappears, a woman holding a grocery bag approaches it and enters; Montano identified the woman as the victim. The Beetle drives offscreen, but then reappears, driving down the parking lane in which it had originally been parked. While the Beetle is driving down the parking lane, the silver vehicle that defendant entered begins backing out of its space; the Beetle drives up to the vehicle, then waits as it backs out directly in front of the Beetle. The silver vehicle then drives quickly out of the parking lane and toward the righthand side of the screen, with the Beetle following closely behind. Both vehicles then turn down the next parking lane and disappear offscreen. Montano testified that he followed the silver vehicle because he was able to identify defendant inside the vehicle, so he followed it to obtain its license plate.

¶ 18        Montano testified that, among others, he spoke with Chicago police detective Vidas Nemickas, who showed him a lineup of photos; Montano identified defendant from that lineup as the person responsible for shooting the victim. Montano further testified that his conversation with Nemickas was videotaped.

¶ 19        The State next presented the testimony of Chicago police officer Paul Habiak, who responded to a call about a shooting on Karlov on April 8, 2016. When Habiak and his partner, David Garza, arrived at the crime scene, Habiak observed a man standing in the street, leaning

into a gray Volkswagen Beetle and holding a towel or napkin against a woman who was seated in the passenger side of the vehicle. Habiak spoke to the man, who he identified as Montano, and Montano informed Habiak that he had been sitting in the vehicle when a silver Honda pulled up and the driver produced a silver revolver and fired a single shot into the passenger side, breaking the window and striking the victim in the head. Habiak was able to observe broken glass inside the vehicle. Montano informed Habiak that the shooter was named "Giovanni" and gave his approximate address; Habiak disseminated the information over police radio, in case anyone was able to locate him. Habiak testified that the paramedics arrived a few minutes after he did.

¶ 20    Next, the State presented the testimony of Michell Reilly, one of the paramedics who responded to the scene, who testified that the victim had a single gunshot wound to the head and was unresponsive. The paramedics brought her to Mount Sinai Hospital, and Reilly had no further contact with her after that point.

¶ 21    APD Placek conducted Reilly's cross-examination, and asked questions about the location of the wound. APD Placek asked Reilly whether she had refreshed her memory prior to testifying by reviewing the paperwork that she had prepared at the time. In questioning Reilly, APD Placek asked the following questions:

"Q. And so what you're really doing is you're testifying off of your paperwork, correct?

***

A. Paperwork, yes, and a little bit of memory.

Q. And when you say memory, there were a lot of people on the street; correct?

A. Yes.

9

Q. And there was a gentleman with a dog, correct?

A. I have no idea about a gentleman with a dog. I was taking care of my patient, who was unresponsive and [had] a hole in her head. That was my most [*sic*] concern. It's not everybody around me.

Q. Obviously, because you weren't doing an investigation?

THE COURT: All right. Just ask a question.

APD PLACEK: Sure.

THE COURT: Don't start talking obviously because you were doing this and doing that. This is not storytelling time. This is not time for argument. Ask her questions pertinent to what she was called for on direct examination. If you want to call other witnesses to explain what it is, the story you want to tell the jury, you obviously have the right to do that. But let's kind of keep this cross-examination around what her testimony was brought out on direct. Cross-examination is limited to that.

APD PLACEK: Sure, Judge."

¶ 22    APD Placek then continued cross-examining Reilly, asking Reilly when she would prepare paperwork on patients. Reilly testified that she wrote her reports "[a]fter patient care." APD Placek then questioned her as follows:

"Q. Approximately how long later, how much time passed?

A. Since the minute I was on the scene or when?

Q. No, ma'am. I do apologize.

May I withdraw and rephrase, Judge?

THE COURT: Please do.

APD PLACEK: Thank you.

Specifically, when did you do your paperwork?

THE WITNESS: After—

THE COURT: What is the relevance of when she did her paperwork? If you want to—

APD PLACEK: Yes, Judge. Does the Court—

THE COURT: Get to the point first and then maybe we can go into that. Ask her a specific question.

APD PLACEK: Do you do your paperwork, which you refreshed your memory from, directly after?

THE COURT: What are you asking her to refresh her memory about?

APD PLACEK: No, Judge. That's not what I'm saying.

THE COURT: Nothing? You just want to—this is just a general story time? What is your point, please?

APD PLACEK: My point strictly is this: Do you do your paperwork when you return to, in fact, the firehouse?

THE WITNESS: No, ma'am.

Q. So you did it at the hospital?

A. That's correct.

Q. Thank you.

And you did it with or without the help of the doctors?

A. I do it on my own, not with doctors' help.

Q. Thank you."

11

¶ 23    The State next presented the testimony of Ana Galvez, an employee of a dry-cleaning business located next to the Jewel, who testified that on April 8, 2016, at approximately 6:40 p.m., an individual came in to pick up dry cleaning that had been dropped off under defendant's name. Galvez testified that the business was equipped with video surveillance, and the parties stipulated to the accuracy of the video showing the exchange, which was admitted into evidence and published to the jury.

¶ 24    The State next presented the testimony of Chicago police lieutenant Russell Willingham, who testified that he was working as a tactical sergeant on April 8, 2016. When he arrived at the scene, he observed a vehicle with a broken passenger's side window and a woman inside who appeared to have a gunshot wound to the head. He ordered the scene to be secured and attempted to locate witnesses, and he spoke to Montano, who told him the shooter's name was "Giovanni" and gave his approximate address and potential known associates. Montano also informed Willingham that he and Giovanni had been involved in an altercation at the nearby Jewel, and that they had previously been involved in an altercation in October 2015; Montano also showed Willingham photos that he had taken on his cell phone. After entering the information given to him into the police computer systems, Willingham developed defendant as a potential suspect. Willingham was also able to locate the police report from the prior altercation between Montano and defendant.

¶ 25    The State next presented the testimony of Chicago police detective Vidas Nemickas, who testified that he served as an independent administrator of a photo array shown to Montano. Nemickas testified that he had no knowledge of the case, he had no knowledge of who the suspect was, and he had no involvement in compiling the photo array. Nemickas testified that

he administered the photo array to Montano in an interview room upstairs in Area Central police headquarters, and that the meeting with Montano was videotaped.

¶ 26     APD Placek conducted the cross-examination of Nemickas, and began by confirming that Nemickas had no involvement with the case other than showing Montano the photo array and that he had no knowledge of anyone's interactions with Montano either before or after the lineup. APD Placek questioned Nemickas as follows:

"Q. Did you pick the room—the room you were in?

A. I believe it was the only room available.

Q. Because that's not a conference room, is it?

A. No, it's not.

Q. That's in fact a—well, what room is it?

THE COURT: What's the relevance of the room?

APD PLACEK: I believe in closing, Judge, there will be a—

THE COURT: I don't think so. Let's move on, please, to what the detective can testify to.

APD PLACEK: Is that—

THE COURT: Let me finish, please. Ask him a question that's relevant to what he's here for.

APD PLACEK: I believe I was, Judge.

THE COURT: Well, I don't. I don't think you were even close. Everybody is thrilled to know about your knowledge of Area Central's room. The detective is an independent administrator of a lineup procedure. That's what he testified to, not about

13

how long somebody else might have talked to him. Please stick to the point of the case, I beg of you.

APD PLACEK: The bar on the back, is that used to handcuff prisoners on the back of the bench—

THE COURT: And the relevance of that would be?

APD PLACEK: —in the room?

THE COURT: The relevance of that would be?

APD PLACEK: Judge—

THE COURT: Is the man handcuffed? Is anybody handcuffed in the room? Can the room not have multiple purposes?

APD PLACEK: Not for that five minutes, no, Judge.

THE COURT: Please.

APD PLACEK: Is the Court sustaining on its own objection?

THE COURT: Yes. Please, I just want you to stay on point, Ms. Placek. Please stay on point.

APD PLACEK: I believe I am, Judge."

¶ 27    APD Placek then continued cross-examining Nemickas:

"Q. An independent administrator is part of the reforms by the Chicago police and required by the federal court, correct?

A. I'm not aware of that.

Q. Do you know why there's an independent administrator to conduct show-ups, lineups, and photo arrays?

14

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Sustained.

APD PLACEK: Well, Officer, would it be correct in saying that you don't know anything about this case at all?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Do you know—you mean other [than] what he's testified to?

APD PLACEK: Other than what we saw on the—

THE COURT: Other than what he's testified to?

APD PLACEK: Correct.

THE COURT: All right.

THE WITNESS: I have no knowledge of the case whatsoever except for what you saw right there on video.

APD PLACEK: So, therefore, you don't know whether or not Mr. Montano is correct or not?

THE COURT: You're arguing—You're trying to argue your case.

APD PLACEK: I'm not, Judge.

THE COURT: There's a time for argument. Yes, you are. He's answered your question and now you're going to try to suggest something that he doesn't know—fill in the blanks what you intend to argue.

APD PLACEK: No, Judge.

THE COURT: That's for argument, not for a question. He answered your question. If you don't have any other relevant questions, why don't you just have a seat. In fact,

I'm telling you to have a seat because you're not asking any questions of this individual that's relevant to his examination.

APD PLACEK: Your Honor, I'd ask for a sidebar.

THE COURT: No. If you have another legitimate question, I'll ask you to ask it, but not this line of questioning that has nothing to do with what he did in this particular case.

APD PLACEK: Based on the Court's ruling, Judge, we have no further questions."[4]

¶ 28    The State next presented the testimony of Chicago police detective David Sipchen, who testified that he was part of a team of detectives assigned to investigate the April 8, 2016, shooting. When he arrived at the scene, he observed a silver Volkswagen Beetle with the front passenger door open and broken glass from the window on the ground and inside the vehicle. The victim was no longer at the scene. There was only one witness remaining at the scene, a man named George Maslona. Sipchen later returned to the station, where Montano was present. Montano had previously spoken with police and an assistant State's Attorney and had been shown a photo array. The next day, Sipchen visited the dry cleaner, where he obtained receipts and a video, and a different detective obtained video from the Jewel. The following day, Sipchen and other detectives interviewed Maslona, who was on the street when the shooting occurred, but he was not asked to participate in any identification procedures because he was unable to observe anyone inside the vehicle. Sipchen testified that efforts were made to locate

---

[4] We note that, during oral argument, the State claimed that there were numerous sidebars during the trial. However, our review of the record shows that there were no sidebars during the trial, other than a single sidebar for scheduling purposes, and this interaction was the only time an attorney requested a sidebar for a substantive purpose.

defendant, but those efforts were unsuccessful and an investigative alert was placed in the system. Defendant was ultimately arrested on April 21, 2016.

¶ 29    After Sipchen's testimony, the trial was continued until the next day. Prior to resuming trial and outside the presence of the jury, the defense made a motion for a mistrial, claiming that the trial court was prejudiced against APD Placek and had made its feelings clear to the jury. The defense began by pointing to the court's "annoy[ance]" based on the presence of a witness in the courtroom prior to opening statements, and the court addressed that issue by noting that APD Placek had come into the courtroom with the witness as the jury was entering the courtroom, instead of asking one of the other defense attorneys to handle the witness outside of the courtroom. The court stated:

> "You had to do that in front of the jury and making a grand display of your importance in this particular procedure above all others, above the jury, above those 14 people who were here on time that was what was necessary on your part.
>
> So with respect to that issue, your motion for mistrial is denied."

¶ 30    APD Placek asked if she could continue and point out another incident, and the court commented:

> "I have ruled, Ms. Placek. That's one of the problems. You do not seem to understand that when a court rules you have to live with it. You can make your motions which you are doing now.
>
> But once you are done arguing, and I ruled, that's the end of it. I don't want to go on endlessly with you in trying to direct you to do your job the appropriate way, not constantly making grandstanding explanations before the Court, before the jury to express your vast knowledge of the world of criminal law.

17

I mean it's wonderful that you know that Chicago Fire Department Officials might work on their reports but you think you can cross-examine then infinitum about their reports when their reports never came into discussion as being at issue in the particular case. You just wanted to make a point and then you are asking her about talking to the surgeon or the doctor or something like that. Meaningless cross-examination designed to do nothing in my mind but waste the jury's time, waste my time.

I tell the jury early on that I am going to try to be mindful of the time that they are in the courtroom. And that I will only allow them to hear material, and relevant, and competent evidence. So I have an obligation to live up to my word.

In my mind there was absolutely nothing with respect to like the fire department official that fell into one of those categories so I know I am legally ahead of where your argument probably intends to go.

But it's just an example of the problem, you know, everything has to revolve around you. You never sort of just allow a trial to proceed without heavy drama. It's always a [*sic*] very dramatic and it just—there is no place for it. This is a courtroom. I try to run the courtroom as fairly and impartially as I can. When it's time for you to argue a case, I allow you to argue. But I don't allow you to argue during cross-examination. That's not an appropriate time to ask argumentative questions.

And I will point out another one of your completely inappropriate questions and that was to the detective the independent administrator. You agreed to the State's motion in limine regarding not discussing other cases and other issues involving the Chicago Police Department or other cases. But yet all of a sudden for some reason you

felt it was appropriate to ask the independent administrator in this case whose every action was on video tape to try to talk about a federal consent decree.

That was unfair. It was unfair. It was inappropriate and it had no business being in this courtroom. If the police officers had done something which violated the rules of procedure that had been set up regarding identification, it would have been appropriate. But when they follow their guidelines, when they follow what the law requires them to do now to then try to embarrass them by some actions of other police officers who didn't follow them in the past and it created misidentifications, that's unfair.

And so you seem to always want to walk on that edge, and I don't like it. I don't like it one bit. I don't like it from you. I don't let the State do it. I don't let the defense do it.

So now you know where I stand. If you think I have a prejudice, a personal prejudice against you, I do not, Ms. Placek. But I have a prejudice against some of your tactics that you used in this particular case."

¶ 31       In response, APD Placek argued that some of what the court termed "tactics" were not tactics and continued:

"I think this is where, in fact, the Court and I—I don't have a problem with the Court but I believe that the Court often expresses in front of the jury a problem with me. And the issue became even in the questioning of the mother of the victim.

I think at the beginning of a trial the Court sets the tone in what the court believes or doesn't believe about different sides. We believe that it was patently unfair and the Court knows that from time in memorial [*sic*] there has been nothing wrong with, in

19

fact, expressing sympathy to a victim's survivor. Especially after cross-examining. This was my last question. I am sorry for your loss."

The court responded:

"THE COURT: Is that a question? Is that a question?

APD PLACEK: No, Judge, but it is, in fact—

THE COURT: What are you supposed to ask witnesses? Questions.

You made a statement. You made a statement designed to engender some sort of emotional response from the jury about what a wonderful person you are and how sorry you feel for the mother of a dead child. You are not allowed to do that. The State can't do that. They can't wrap their arms around the deceased family any more than you can try to. So that's the reason. You don't make statements in this courtroom."

¶ 32     APD Placek argued that the problem was that, even if the court believed it was not a question, "the Court has pointed out to the jury the reason supposedly why I have said it," which was her "over dramatic tactics." The court responded: "All right. Motion for mistrial is denied. I'm not going to waste my time listing."[5]

¶ 33     The parties then proceeded to discuss jury instructions, after which the jury was seated and the trial resumed. The State presented the testimony of Dr. Ponni Arunkumar, chief medical examiner at the Cook County medical examiner's office, who testified that she performed an autopsy on the victim after her death. Arunkumar opined that the cause of the victim's death was a gunshot wound to the head. After Arunkumar's testimony, the State rested. The court then addressed the defense, stating "All right. We can deal with your issue later appropriately

---

[5] We note that defendant claims that "listing" is a typo for "listening," while the State claims that the trial court meant that the court was not going to "waste [its] time listing" the reasons for the denial.

without waiving anything if you would like to proceed." APD Placek responded: "We are indeed, Judge."

¶ 34      The defense then presented the testimony of Victoria Zavala, who testified through an interpreter that she lived on the same block as the shooting and was at home at the time, watching television. At approximately 7 p.m., she heard a noise "like a thunder" and looked out the window to the street. She observed a gray Volkswagen with a man standing outside, "looking nervous" and walking back and forth "as if looking for help." He went into a home approximately four doors down, then came back out. When he returned to the vehicle, the police were there.

¶ 35      The defense also presented the testimony of George Maslona, who witnessed the shooting while he was walking his dog down Karlov. Maslona was standing by a fence with his dog, and he noticed a man parking a silver Volkswagen. As the man exited the vehicle, Maslona "heard the shooting sound. And I heard the glass break, hit the ground and squealing of the wheels. It happened simultaneously. One, two, three." Maslona observed a vehicle driving "really fast" and turning down an alley; Maslona was unable to read a license plate or view the driver, he but observed that "it was a dark car." The man in the Volkswagen ran toward a house and Maslona asked him what happened. He asked Maslona to call the police, and Maslona dialed 911 while the man ran into a house. When the man returned, the police were already at the scene; Maslona testified that the police appeared within five minutes.

¶ 36      After Maslona's testimony, the jury left the courtroom and the court informed the parties:

> "Prior to the defense proceeding to call evidence in order to not take the jury out and bring them back again, I indicated to the defense that they would be able to make

any motion that they wished to make at the close of the State's case at this time without waiving anything by going forward with evidence."

The defense then proceeded to make a motion for a directed verdict, which the trial court denied.

¶ 37    When the jury returned, the defense entered into evidence a stipulation by the parties as to portions of Montano's grand jury testimony for purposes of impeachment, and then rested. After the parties presented closing arguments, the jury found defendant guilty of both first-degree murder and attempted murder and found that defendant personally discharged a firearm in the commission of both offenses. The trial court entered judgment on the verdicts and continued the matter for sentencing.

¶ 38    On May 23, 2019, defendant filed a motion for a new trial, and filed a supplemental motion for a new trial on September 6, 2019. On September 10, 2019, the parties appeared before the court for disposition of the posttrial motions and sentencing, and defendant informed the court that he would be "proceeding in pro se *** [f]or the moment, and I'll be firing my defense counsel. I'll be adopting the motion that she has, and then I'm going to add some of my own key points to it, and I would like to trigger a Krankel hearing for ineffective assistance of counsel." The court asked defendant to explain what his issues were with his attorneys, and defendant responded that "the basic [issue] was my alibi witnesses were never interviewed, so they were never contacted." Defendant explained that he was referring to the two people who were with him at the Jewel, David Lozano and Adrian Ramos. The court asked defendant what these witnesses would have testified to, and defendant responded that they would testify that they were with defendant at Lozano's house at the time of the shooting. The court asked if he informed his attorneys about his alibi, and defendant responded that he did not recall telling

anyone because "[m]y attorney never came to visit me. [APD Placek] never came to visit me." Defendant informed the court that he did not have any affidavits from his witnesses yet, but that Lozano had informed him that he would testify, and that a third party had informed him that Ramos would also testify.

¶ 39     Defendant further claimed that he was not prepared for trial because APD Placek never visited him. The court asked if his other attorneys visited, and defendant responded that "[o]nce," an intern came to visit him. APD Placek interjected and explained to the court that the intern was her law clerk and that they both visited defendant together. The court asked defendant how many times he had the opportunity to speak with his attorneys while his case was pending. Defendant responded, "[j]ust once," and the court asked "[w]hat about every time when you would be brought to the courtroom?" The court noted that by its records, APD Placek personally appeared on defendant's behalf approximately 30 times, and defendant responded, "[i]n the back bullpen. It only consists of like two-minute conversations, probably less than that." The court asked:

> "What was it that you wanted to discuss with her at Cook County Jail that you couldn't discuss with her when she would see you in the lockup because virtually every day that the case was up—
>
> DEFENDANT: My whole trial strategy, everything, period.
>
> THE COURT: Let me finish.
>
> Almost every time the case was up at some point in the morning your counsel would be here and the case would not immediately be called. There was always invariably a rather lengthy delay between the time when Ms. Placek would arrive and she would indicate that she was actually ready to have the case called and certainly the majority

of that time frame or certainly a high percentage from the Court's own observations were spent where she was in the lockup area of the courtroom where you were confined.

You're shaking your head no, but I've seen her walk out of that doorway that leads to the lockup—

DEFENDANT: But you see her come right back out in seconds.

THE COURT: —dozens of times. I've seen *** co-counsel, do the same.

DEFENDANT: That's not enough time to prepare for trial, though.

THE COURT: If she had spent more time with you at Cook County Jail, what would have been different?

DEFENDANT: I would have gave her my whole output on the whole case as far as the witnesses, my side of the story.

* * *

THE COURT: You never told your attorneys your side of the story?

DEFENDANT: Because they never came to visit."

¶ 40        After defendant finished his arguments, the court asked defense counsel to address defendant's claim that he was not properly prepared for trial. They claimed that they had visited defendant at the jail several times, and they had investigated any possible defenses and witnesses. APD Placek informed the court that defendant had not provided the last names of his "alibi" witnesses. She further claimed that defendant had not told defense counsel that he was at someone else's house at the time of the shooting but instead claimed that he was present at the time of the shooting but that his witnesses would testify that he was not the shooter. APD Placek informed defendant that the defense was not one that she believed would be successful. The other assistant public defender present in court agreed with APD Placek, stating that it was

24

his recollection that defendant's "alibi" was that he was present on the street but did not do the shooting. Defendant interjected, stating "I never said that." He continued, saying that "I said that from the beginning that I always had an alibi, that's why I have alibi witnesses."

¶ 41 APD Placek further informed the court that she was contacted by an individual named David who told her that he did not want to be involved in the case because he was afraid of being charged, and she informed defendant about the matter. Defense counsel also sought to find "Adrian," but was unable to do so without a last name. The court asked defendant when he learned the last names of the witnesses, and defendant responded that "I always knew the last names. These are my friends. It's kind of not making sense that I wouldn't give them their last names. I've been knowing these guys, so *** I wouldn't leave out their last names."

¶ 42 The court found that defendant had not established a sufficient basis for the appointment of separate counsel to proceed to further argument regarding ineffective assistance of counsel. The court found:

"You told me earlier today that you never completely told your lawyers that you did, in fact, have an alibi defense for the time of the shooting. Their general attempts to interview you, regarding those people that you were in the car with prior to the shooting taking place and was on the video from the establishment, I believe that they were trying to locate those people to determine whether or not they could in any way be beneficial to you. And I believe the attorneys when they say that they were presented with individuals who were uncooperative and that actually makes a lot more sense to me than that they would come forward and place themselves with you at the time, provide law enforcement with their full names because one could make an argument that they would have then become co-defendants, that they might also be responsible,

legally responsible, for what happened to the deceased and to the other male that was shot at even though they never fired the weapon.

\*\*\*

I keep going back to the point where you told me earlier today that you never told your attorneys that you actually had an alibi that you were at David Lozano's house, and I believe the attorneys when they were trying to find out who these people were, what their last names were, and you couldn't provide them. You could have provided them—

DEFENDANT: I did.

THE COURT: —I suspect, [defendant], like you are now, but you chose not to because you were trying to protect them from what might occur to them. You were trying to prevent them from being in the same situation that you were in.

You have to have known their names. You were with them that day, it's on video that you were with them, and your decision to perhaps, you know, have a higher loyalty to those other individuals prevented your attorneys from being able to completely interview them, to see if there was something that they could have said."

¶ 43    The court then turned to the posttrial motions, and asked defendant if he wished to have the public defenders argue the motion or if he wanted to proceed *pro se*. Defendant responded that he wanted counsel to argue the motion. In arguing the motion for new trial, APD Placek again claimed that the trial court was prejudiced against her. The court denied the motion, stating:

"All right. I don't intend to try to comment on the matters raised in this supplemental motion for a new trial, most of which appear to be just a personal attack upon the Court by Ms. Placek but maybe a general statement is appropriate.

I've been a trial lawyer and/or a trial judge for almost 50 years, and I've tried cases not only in this building, on this floor, in fact, over the course of those many years since the '70s but also in other jurisdictions, other counties, federal court, juries in federal court, and I have a great deal of respect for the law and for the trial process, and I am not one that gives in or would in any way concede that somehow the rules are different at 26th and California as opposed to any other county or state or federal jurisdiction. But there are attorneys that seem to believe that's true, oh, that's what we do at 26th and Cal, that we can make inappropriate arguments, we can make inappropriate objections, we can act out in front of the jury, we can disrespect counsel, opposing counsel, we can try for the—ask the inappropriate question, ask deliberately the objectionable question, make the deliberately inappropriate remark because we're at 26th and Cal.

When I was a prosecutor in this building, I didn't do it; when I was a defense lawyer in this building, I didn't do it; and I didn't do it in any other courtroom that I ever practiced in because I respect the process and I respect this building and I respect the justice that is administered in this building. And I've done nothing over the course of my career except try to make sure that the decisions that I make, the arguments I advanced were based on the law and the evidence, not personal attacks.

So the fact that you seem to believe that my attacks on you are made out of some sort of vendetta, Ms. Placek, is simply not true. But I won't let you abuse your position

and I won't let you turn my courtroom into some sort of a circus atmosphere, which seems to follow your show."

¶ 44    The court then proceeded to sentencing, where it noted that it was concerned about whether the one-act, one-crime doctrine applied and had asked the parties to conduct briefing on the issue. The court noted that neither the parties, nor the court, had been able to find a case directly on point, but that the Illinois Supreme Court in *People v. Shum*, 117 Ill. 2d 317 (1987), had upheld two convictions based on a single shooting where a woman and her unborn child were both killed by the defendant's "single action." The trial court pointed to the supreme court's language as instructive: "In Illinois, it is well-settled that separate victims require separate convictions and sentences. Shum goes on, but I believe that is the clearest language that has been considered by the Court which I believe would mandate that [defendant] be sentenced both on the first-degree murder conviction and the attempt first-degree murder conviction." After considering evidence in aggravation and mitigation, the trial court sentenced defendant to consecutive sentences of 50 years for the first-degree murder of the victim and 26 years for the attempted first-degree murder of Montano.

¶ 45    Defendant filed a motion to reconsider his sentence on October 4, 2019, and a supplemental motion on November 12, 2019. The trial court denied defendant's motions on November 15, 2019. Defendant filed a timely notice of appeal on the same day, and this appeal follows.

¶ 46                                ANALYSIS

¶ 47    On appeal, defendant raises a number of issues, including: (1) that the trial court's comments to APD Placek prejudiced the jury and deprived him of a fair trial, (2) that the State failed to prove him guilty beyond a reasonable doubt, (3) that the trial court erred in denying defendant a *Krankel* hearing to evaluate his claims of ineffective assistance of counsel, and (4)

that the trial court violated the one-act, one-crime doctrine by imposing sentences for two convictions that were based on the same act. We consider each argument in turn.

¶ 48                                I. Comments to APD Placek

¶ 49      We first consider defendant's claims about the trial court's comments to APD Placek in front of the jury, which defendant claims deprived him of a fair trial. Defendant claims (1) that the trial court deprived him of his right to a fair trial by displaying bias against the defense in front of the jury and (2) that the trial court erred by denying the motion for mistrial or in not recusing itself based on its prejudice against the defense. Defendant further claims that the trial court's prejudice against APD Placek prevented the defense from being able to fully present its case, depriving him of his right to effective assistance of counsel.

¶ 50                                A. Bias Against Defense

¶ 51      "A trial judge has a duty to see that all persons are provided a fair trial." *People v. Sims*, 192 Ill. 2d 592, 636 (2000) (citing *People v. Burrows*, 148 Ill. 2d 196, 250 (1992)). Accordingly, a trial judge "must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party." *Sims*, 192 Ill. 2d at 636 (citing *People v. Garrett*, 276 Ill. App. 3d 702, 712 (1995)). " 'Jurors are ever watchful of the attitude of the trial judge and his influence upon them is necessarily and properly of great weight, thus his lightest word or intimation is received with deference and may prove controlling. In a criminal trial, a hostile attitude toward an accused, or his witnesses, is very apt to influence the jury in arriving at its verdict.' " *People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 46 (quoting *People v. Marino*, 414 Ill. 445, 450-51 (1953)). "Judicial comments can amount to reversible error if the defendant can establish that such comments were 'a material factor in the conviction or were such that an effect on the jury's verdict was the probable result.' " *Burrows*, 148 Ill. 2d at 250 (quoting

*People v. Harris*, 123 Ill. 2d 113, 137 (1988)). " 'Where it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed.' " *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 57 (quoting *People v. Williams*, 209 Ill. App. 3d 709, 718-19 (1991)). In evaluating the effect of the trial court's comments upon the jury, we consider the evidence, the context in which the comments were made, and the circumstances surrounding the trial. *Lopez*, 2012 IL App (1st) 101395, ¶ 57.

¶ 52        In the case at bar, defendant claims that the trial court displayed bias by making derogatory statements to APD Placek, by forming premature judgments against the defense, and by rendering inconsistent rulings of law. With respect to the court's comments to APD Placek, defendant focuses on comments made during (1) cross-examination of Araiza, The victim's mother, (2) cross-examination of Reilly, the paramedic, and (3) cross-examination of Nemickas, the independent administrator of the photo array.[6] Defendant also takes issue with comments the court made to APD Placek during the defense's motion for mistrial and during sentencing. We note that, because these comments were not made in the presence of the jury, they cannot have had an effect on the jury's verdict.[7] See *People v. Young*, 248 Ill. App. 3d 491, 502 (1993) ("It is axiomatic that any comments made outside the presence or hearing of the jury cannot effect [*sic*] the jurors."); *Lopez*, 2012 IL App (1st) 101395, ¶ 71 (noting that sidebars held outside of the presence of the jury "could not have resulted in a biased jury").

---

[6] We note that in its motion for a mistrial, the defense claimed that the first time the trial court demonstrated its "annoy[ance]" with APD Placek was when a witness was present in the courtroom at the beginning of trial. However, on appeal, defendant does not raise this occasion as one of its bases for reversal.

[7] We note that defendant claims that these comments can show prejudice, despite occurring outside the presence of the jury. However, the case defendant cites in support of this proposition, *People v. Phoung*, 287 Ill. App. 3d 988 (1997), occurred in the context of a bench trial, not a jury trial, meaning that the judge making the inappropriate comments also served as the factfinder.

However, in denying the motion for mistrial, the trial court explained its reasoning for some of its earlier comments, so we will consider its comments during that ruling where necessary to evaluate the propriety of the court's actions.

¶ 53     As noted, the first comment made during the trial that defendant challenges on appeal occurred at the end of APD Placek's cross-examination of Araiza, the victim's mother. APD Placek concluded her cross-examination by telling Araiza "I'm sorry for your loss," and the trial court admonished her: "No more comments like that in the future, trying to engender any sympathy from the jury for yourself." Defendant claims that this expression of condolence "was entirely proper," pointing to our supreme court's decision in *People v. Sims*, 192 Ill. 2d 592 (2000), in support. However, in that case, the supreme court found that the defendant was not denied a fair sentencing hearing where the trial judge told the victim's grandmother " 'I am sorry about your loss, ma'am' " after she read a victim impact statement before the jury. *Sims*, 192 Ill. 2d at 636. The supreme court found that the judge's statement "was merely a polite expression of condolence, and it did not reflect a bias for or against any party." *Sims*, 192 Ill. 2d at 636. *Sims* thus does not stand for the proposition that expressions of condolence are proper during examination or cross-examination of a witness, but merely holds that such a statement by a judge does not reflect a bias for or against a defendant. Consequently, we find *Sims* to be of limited applicability to the issue before us.

¶ 54     We note that the trial court explained the reason for its comment to APD Placek when it was denying defendant's motion for a mistrial, stating:

"What are you supposed to ask witnesses? Questions.

You made a statement. You made a statement designed to engender some sort of emotional response from the jury about what a wonderful person you are and how sorry

31

you feel for the mother of a dead child. You are not allowed to do that. The State can't do that. They can't wrap their arms around the deceased family any more than you can try to. So that's the reason. You don't make statements in this courtroom."

Thus, the trial court made clear that its issues with APD Placek's comment was (1) that it was not a question and (2) that it was focused on eliciting an emotional response from the jury. The trial court was certainly within its rights to limit cross-examination to questions, rather than statements. See *People v. Klepper*, 234 Ill. 2d 337, 355 (2009) (a trial court retains wide latitude to impose reasonable limits on the scope of cross-examination). However, the trial court's comment to APD Placek went beyond that, suggesting that she was "trying to engender *** sympathy from the jury for yourself," a sentiment that the court repeated in denying the motion for mistrial. In other words, the court inferred a particular motivation behind APD Placek's question. While we make no comment as to the accuracy of the trial court's inference, the problem is that the court verbalized that inference before the jury, leading the jury to believe that APD Placek was expressing her condolences to Araiza in order to elicit sympathy from the jury. This was unnecessary and served only to diminish APD Placek's credibility to the jury. The court's comments should not have been made in front of the jury, and would have been better served at a sidebar outside of the jury's hearing. However, we do not find that it rises to the level of prejudicing the jury against defendant.

¶ 55    Next, defendant claims that the trial court made "additional disparaging remarks" toward APD Placek in the context of her cross-examination of Reilly, the paramedic. Defendant points to two sets of comments. First, in questioning Reilly about her memory of the scene, APD Placek asked Reilly:

"Q. And there was a gentleman with a dog, correct?

A. I have no idea about a gentleman with a dog. I was taking care of my patient, who was unresponsive and [had] a hole in her head. That was my most [*sic*] concern. It's not everybody around me.

Q. Obviously, because you weren't doing an investigation?

THE COURT: All right. Just ask a question.

APD PLACEK: Sure.

THE COURT: Don't start talking obviously because you were doing this and doing that. This is not storytelling time. This is not time for argument. Ask her questions pertinent to what she was called for on direct examination. If you want to call other witnesses to explain what it is, the story you want to tell the jury, you obviously have the right to do that. But let's kind of keep this cross-examination around what her testimony was brought out on direct. Cross-examination is limited to that."

Defendant claims that the trial court's comments were inappropriate, because APD Placek was conducting "legitimate cross-examination" and was merely attempting to establish the scope of Reilly's involvement in the case. Again, the trial court was well within its rights to limit the cross-examination to questions from counsel, rather than statements or argument. However, the trial court's comments again went beyond that point, characterizing the line of questioning as "storytelling time." This language trivialized the line of questioning and suggested to the jury that APD Placek was not conducting an appropriate cross-examination.

¶ 56    This trivialization continued with the second set of comments challenged by defendant, where the court again accused APD Placek of engaging in "story time." During this exchange, APD Placek was attempting to cross-examine Reilly about the process of her filling out reports. APD Placek asked:

"APD PLACEK: Specifically, when did you do your paperwork?

THE WITNESS: After—

THE COURT: What is the relevance of when she did her paperwork? If you want to—

APD PLACEK: Yes, Judge. Does the Court—

THE COURT: Get to the point first and then maybe we can go into that. Ask her a specific question.

APD PLACEK: Do you do your paperwork, which you refreshed your memory from, directly after?

THE COURT: What are you asking her to refresh her memory about?

APD PLACEK: No, Judge. That's not what I'm saying.

THE COURT: Nothing? You just want to—this is just a general story time? What is your point, please?

APD PLACEK: My point strictly is this: Do you do your paperwork when you return to, in fact, the firehouse?

THE WITNESS: No, ma'am.

Q. So you did it at the hospital?

A. That's correct.

Q. Thank you.

And you did it with or without the help of the doctors?

A. I do it on my own, not with doctors' help.

Q. Thank you."

¶ 57     We agree with defendant that it appears that the trial court's comments arose from its difficulty in understanding the point that APD Placek was attempting to make, namely, that the reports authored by Reilly were not made at the crime scene but were made later at the hospital. The defense was attempting to show that the report was prepared well after the event and counsel wanted to know whether Reilly had any assistance in preparing the report. Consequently, the court asked APD Placek for the relevance of the line of questioning. However, in doing so, the court repeatedly interrupted the cross-examination, suggesting that APD Placek was not asking relevant questions and asking her to "[g]et to the point." This repeated interruption, combined with the court's characterization of the line of questioning as "story time," again unnecessarily placed APD Placek's credibility and professionalism into question before the jury. Again, these comments by the trial court would have been better served in a sidebar outside the presence of the jury.

¶ 58     We note that, as with the first set of comments, the trial court addressed its reasoning behind its comments in denying the motion for mistrial:

> "I mean it's wonderful that you know that Chicago Fire Department Officials might work on their reports but you think you can cross-examine then infinitum about their reports when their reports never came into discussion as being at issue in the particular case. You just wanted to make a point and then you are asking her about talking to the surgeon or the doctor or something like that. Meaningless cross-examination designed to do nothing in my mind but waste the jury's time, waste my time."

Thus, the court clearly believed that APD Placek was conducting "[m]eaningless cross-examination." However, APD Placek's cross-examination essentially consisted of (1) asking Reilly if she was testifying based on her reports from the time of the shooting or from memory,

and (2) asking when and how she completed those reports. We find nothing inappropriate in this line of questioning, and it is certainly not a "waste [of] time" to conduct such a cross-examination; indeed, the State itself objected to only a single question during the entirety of the questioning. More importantly, as noted, regardless of the necessity of the line of questioning, the trial court again chose to make its feelings known to the jury instead of addressing APD Placek privately in a sidebar. Again, however, we find that the trial court's comments did not rise to the level of prejudicing the jury against defendant.

¶ 59        The final sets of comments challenged by defendant occurred during APD Placek's cross-examination of Nemickas, the independent administrator of the photo array. The first set of comments occurred when APD Placek questioned Nemickas about the room in which the identification took place:

> "Q. Did you pick the room—the room you were in?
>
> A. I believe it was the only room available.
>
> Q. Because that's not a conference room, is it?
>
> A. No, it's not.
>
> Q. That's in fact a—well, what room is it?
>
> THE COURT: What's the relevance of the room?
>
> APD PLACEK: I believe in closing, Judge, there will be a—
>
> THE COURT: I don't think so. Let's move on, please, to what the detective can testify to.
>
> APD PLACEK: Is that—
>
> THE COURT: Let me finish, please. Ask him a question that's relevant to what he's here for.

APD PLACEK: I believe I was, Judge.

THE COURT: Well, I don't. I don't think you were even close. Everybody is thrilled to know about your knowledge of Area Central's room. The detective is an independent administrator of a lineup procedure. That's what he testified to, not about how long somebody else might have talked to him. Please stick to the point of the case, I beg of you.

APD PLACEK: The bar on the back, is that used to handcuff prisoners on the back of the bench—

THE COURT: And the relevance of that would be?

APD PLACEK: —in the room?

THE COURT: The relevance of that would be?

APD PLACEK: Judge—

THE COURT: Is the man handcuffed? Is anybody handcuffed in the room? Can the room not have multiple purposes?

APD PLACEK: Not for that five minutes, no, Judge.

THE COURT: Please.

APD PLACEK: Is the Court sustaining on its own objection?

THE COURT: Yes. Please, I just want you to stay on point, Ms. Placek. Please stay on point.

APD PLACEK: I believe I am, Judge."

¶ 60    Defendant claims that these comments constituted the trial court "mock[ing]" and "harass[ing]" APD Placek. As with its comments during Reilly's cross-examination, the trial court repeatedly interrupted the cross-examination to question APD Placek about the relevance

of the questions she was asking, despite the fact that there had been no objections by the State as to the line of questioning. More problematically, the trial court's comment that "[e]verybody is thrilled to know about your knowledge of Area Central's room" is undeniably sarcastic, and we agree with defendant that it was unnecessary. Again, the court's repeated interjections that APD Placek was asking irrelevant questions, combined with its sarcastic comment, served only to diminish APD Placek's standing before the jury.

¶ 61    Defendant also contends that the trial court "exhibited further prejudice" against APD Placek at the end of her cross-examination of Nemickas. APD Placek asked Nemickas:

"APD PLACEK: Well, Officer, would it be correct in saying that you don't know anything about this case at all?

ASSISTANT STATE'S ATTORNEY: Objection.

THE COURT: Do you know—you mean other [than] what he's testified to?

APD PLACEK: Other than what we saw on the—

THE COURT: Other than what he's testified to?

APD PLACEK: Correct.

THE COURT: All right.

THE WITNESS: I have no knowledge of the case whatsoever except for what you saw right there on video.

APD PLACEK: So, therefore, you don't know whether or not Mr. Montano is correct or not?

THE COURT: You're arguing—You're trying to argue your case.

APD PLACEK: I'm not, Judge.

38

THE COURT: There's a time for argument. Yes, you are. He's answered your question and now you're going to try to suggest something that he doesn't know—fill in the blanks what you intend to argue.

APD PLACEK: No, Judge.

THE COURT: That's for argument, not for a question. He answered your question. If you don't have any other relevant questions, why don't you just have a seat. In fact, I'm telling you to have a seat because you're not asking any questions of this individual that's relevant to his examination.

APD PLACEK: Your Honor, I'd ask for a sidebar.

THE COURT: No. If you have another legitimate question, I'll ask you to ask it, but not this line of questioning that has nothing to do with what he did in this particular case.

Defendant contends that the trial court's comments demonstrated bias and that APD Placek should have been permitted to address the court in a sidebar to explain the relevance of the testimony she was pursuing.

¶ 62        As noted, the trial court was within its rights to limit cross-examination to questions, rather than argument. However, again, the court went beyond that point in its comments to APD Placek. The court first suggested that not only was APD Placek asking an argumentative question, but that she was "going to try to suggest something that he doesn't know—fill in the blanks what you intend to argue." This comment implies that APD Placek was planning on improperly "fill[ing] in the blanks" of Nemickas' testimony in order to support her argument, rather than relying on the evidence itself.

¶ 63      Additionally, the trial court then ordered APD Placek to "have a seat" unless she had relevant questions to ask the witness. The court then doubled down, stating that "I'm telling you to have a seat because you're not asking any questions of this individual that's relevant to his examination." This had the effect of (1) curtailing APD Placek's cross-examination and (2) highlighting that the court believed APD Placek was asking irrelevant questions. When APD Placek then asked for a sidebar, presumably to discuss the relevance of the line of questioning, the court refused, again highlighting that it believed that APD Placek had not been asking "legitimate" questions.

¶ 64      Based on the court's comments in denying the motion for mistrial, it is clear that the court was extremely unhappy with APD Placek's line of questioning immediately prior to the comments quoted above, in which APD Placek had asked Nemickas about a federal consent decree, in violation of a motion *in limine*. However, if the court had a problem with APD Placek's questions, again, the better course would have been admonishing her privately in a sidebar, rather than highlighting the court's opinion of her questioning in front of the jury.

¶ 65      After examining all of the complained-of comments, we agree with defendant that the trial court made a number of improper comments in front of the jury. However, even if all or some of a trial judge's comments are improper, that does not necessarily cause the jury to be prejudiced against the defendant. See *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 174 (even if some of the trial judge's comments demonstrated frustration with defense counsel, that does not necessarily mean that the judge was displaying bias); *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007) ("The fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel." (citing *People v. Jackson*, 205 Ill. 2d 247, 277 (2001))). Our supreme court has made clear that

"[a] hostile attitude toward defense counsel, an inference that defense counsel's presentation is unimportant, or a suggestion that defense counsel is attempting to present a case in an improper manner may be prejudicial and erroneous." *People v. Harris*, 123 Ill. 2d 113, 137 (1988). Nevertheless, " '[w]here it appears that the comments do not constitute a material factor in the conviction, or that prejudice to the defendant is not the probable result, the verdict will not be disturbed.' " *Lopez*, 2012 IL App (1st) 101395, ¶ 57 (quoting *Williams*, 209 Ill. App. 3d at 718-19).

¶ 66    In the case at bar, after examining the entirety of the trial court's comments in the context of the proceeding as a whole, we cannot find that the comments resulted in prejudice to defendant, depriving him of a fair trial. See *Lopez*, 2012 IL App (1st) 101395, ¶ 57 (the trial court's comments must be considered in the context of the proceeding as a whole). While we have discussed the trial court's comments in depth in our analysis, they comprised only a small part of the overall trial. The State called nine witnesses in its case-in-chief, and APD Placek conducted the cross-examinations of seven of those witnesses. In the course of those cross-examinations, there were only a handful of problematic comments, as we detailed above. The vast majority of the defense's cross-examinations were unproblematic, and none of the challenged comments occurred during the cross-examination of Montano, the State's main and most important witness.[8]

¶ 67    Additionally, the trial court instructed the jury several times not to draw any conclusions from any of the court's comments. When instructing the jury after closing arguments, the court informed the jury that, "[f]rom time to time it has been the duty of the court to rule on the

---

[8] We note that a different assistant public defender cross-examined Montano, who was the second witness to testify, after the victim's mother.

admissibility of evidence. You should not concern yourselves with the reasons for these rulings." Later, the court informed the jury that "[n]either by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." These comments served to cure any prejudicial effect of the court's comments by making it clear that the court was not passing any judgment on the merits of the case through any of its comments or rulings. See *Harris*, 123 Ill. 2d at 139 (considering the fact that the court gave the same instruction in finding no prejudice to defendant from court's comments); *People v. Williams*, 2017 IL App (1st) 142733, ¶ 52 (noting that court gave same instruction in finding no error resulting in prejudice to defendant resulting from court's comment).

¶ 68    Most importantly, there is no indication that any improper comments had an effect on the jury's verdict. The main issue in the case revolved around the question of whether defendant was the shooter. The only witness who observed the actual shooting was Montano, and Montano's identification of defendant as the shooter was critical to the State's case. Our supreme court has consistently held that "the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant." *People v. Harris*, 2018 IL 121932, ¶ 27 (citing *People v. Gray*, 2017 IL 120958, ¶ 36). Thus, Montano's identification of defendant as the shooter was sufficient to establish defendant's guilt beyond a reasonable doubt, if the jury found it credible. Consequently, defendant's defense was predicated on challenging that identification and suggesting that defendant was not, in fact, the shooter. As such, the cross-examination of Montano was the most important cross-examination in the entire trial. APD Placek did not conduct that cross-examination, and defendant does not claim that the trial court engaged in any improper conduct

during that cross-examination. The trial court's problematic comments occurred (1) during the cross-examinations of Araiza and Reilly, neither of whom had any involvement with investigating the shooting or with Montano's identification, and (2) during the cross-examination of Nemickas, whose only interactions with Montano were documented on the video shown to the jury. Thus, none of the trial court's comments affected cross-examination that related to Montano's credibility. Additionally, through cross-examination of other witnesses, APD Placek was able to elicit testimony that was useful in the defense's attempt to discredit Montano, such as Habiak's testimony that (1) there was glass found both inside and outside the victim's vehicle, (2) no bat was recovered from the vehicle, and (3) the police did not search Montano's home or test him for gunshot residue. The jury was entitled to decide whether to credit Montano's identification or not, and we cannot find that the trial court's improper comments had any effect on that decision whatsoever. The jury was shown a video of a part of the previous altercation between defendant and Montano, which supported Montano's testimony. Consequently, while the trial court's comments were inappropriate and should have been made at a sidebar, they did not prejudice the jury against defendant and amount to reversible error. See *Burrows*, 148 Ill. 2d at 250 ("Judicial comments can amount to reversible error if the defendant can establish that such comments were 'a material factor in the conviction or were such that an effect on the jury's verdict was the probable result.' " (quoting *Harris*, 123 Ill. 2d at 137)).

¶ 69        Defendant next claims that the trial court displayed bias by forming premature judgments against the defense. Defendant points to two occasions in which he claims the trial court displayed a premature judgment against him. First, when discussing jury instructions at the beginning of the third day of trial, the defense offered an instruction on second-degree murder.

The court clarified that the defense was claiming that there was some evidence of self-defense, and APD Placek agreed, pointing to Montano's actions in the Jewel parking lot, as well as the fact that he admitted that he had a weapon, namely, the bat. The State objected to the proposed instruction, arguing that the shooting did not occur in the Jewel parking lot. The court declined to give the instruction, finding that given that defendant had informed the court that he would not be testifying, the evidence did not support a second-degree murder instruction.[9] We cannot find that the trial court's denying this instruction displayed a premature judgment.

¶ 70      Defendant claims that the trial court's ruling was "the same thing" as occurred in *People v. Heiman*, 286 Ill. App. 3d 102, 113 (1996), in which the appellate court found that the trial court had improperly rejected the defendant's defense even before the defendant presented his evidence. However, in that case, the trial court made sarcastic comments to a defense witness and questioned his knowledge; made negative comments about another witness; made "excessive and exaggerated derogatory comments" about the defendant during the defense's closing argument; and deprived the defense of an adequate opportunity to present its closing argument by repeatedly interrupting and arguing with defense counsel. *Heiman*, 286 Ill. App. 3d at 112. That is a far cry from what occurred in the case at bar, where the trial court was asked to determine whether a particular jury instruction was supported by the evidence. Here, the State had presented most of its evidence, and the court was informed that defendant would not be testifying, meaning that it had heard all of the evidence relevant to a second-degree murder instruction; the defense did not claim to the trial court, and does not claim on appeal, that it had any additional evidence to support a second-degree murder instruction that was not

---

[9] We note that the jury instruction conference occurred after the State had presented all of its witnesses other than the medical examiner, and after defendant had informed the court that he would not be testifying, but prior to the defense presenting its case.

before the court at the time it made its decision. Accordingly, we cannot find that the trial court's decision not to give that instruction was in any way a "premature judgment" that demonstrated judicial bias.

¶ 71    Defendant's second claim of a "premature judgment" occurred during defendant's request for a *Krankel* hearing. While we discuss the court's decision on that issue later in our analysis, defendant argues that the trial court formed a premature opinion by informing defendant that he viewed his attempts at discharging his counsel as a delay tactic. We do not find this argument persuasive. Defendant's argument overlooks the entire context of the court's comments. When defendant appeared before the court for a hearing on his posttrial motions and for sentencing, he began by informing the court that he would be "firing my defense counsel." Defendant told the court that he would be "adopting the motion that she has, and then I'm going to add some of my own key points to it, and I would like to trigger a Krankel hearing for ineffective assistance of counsel," which defendant claimed would require "full discovery and trial transcripts in order to proceed with everything."

¶ 72    The trial court informed defendant that he had a right to proceed *pro se* at the sentencing, but noted that he was raising the issue over four months after the jury verdict. The court cautioned him:

> "If you represent yourself, I'm not going to just allow you to delay the proceedings. You've had an extraordinarily long period of time between the date of the verdict being returned by the jury and the matter being set down firmly for a sentencing hearing to notify the Court either through counsel or independently that you were going to attempt to proceed in this manner. But when you sort of announce something like that on the day that you are scheduled to go ahead and proceed, I think that would cause just an

inappropriate and unfair delay of the Court being able to administer duties and administer justice to have this case to proceed to its next logical stage. So if you do represent yourself, you're going to have to be prepared to proceed today."

When defendant confirmed that he still wanted to discharge his attorneys, the court explained the procedure for a *Krankel* hearing and informed defendant that "[y]ou can make your allegations and I can allow your attorneys an opportunity to respond so that I can see whether or not [there is] something that would be the basis of perhaps you having new counsel appointed, so you wouldn't necessarily have to go pro se if you didn't want to."

¶ 73      We cannot find that the trial court's comments represented a premature opinion as to the validity of defendant's *Krankel* claim. The trial court merely sought to emphasize to defendant that he could not use the *Krankel* claim, or a change in counsel, as a way of delaying sentencing further, which was an entirely reasonable concern given the fact that defendant raised the claims at the last minute. However, when defendant confirmed that he wished to proceed on his claims, the trial court permitted defendant to present his arguments, which the court then considered.[10] Accordingly, we cannot find that defendant was deprived of a fair trial by any "premature judgments" by the trial court.

¶ 74      Finally, defendant claims that the trial court displayed bias by rendering inconsistent rulings of law. Defendant claims that the trial court consistently ruled in favor of the State and against the defense, and placed restrictions on APD Placek by cutting short her witness examinations and "consistently berat[ing] and harass[ing] her." We do not find this argument

_____

[10] We note that defendant claims that the trial court "mocked" his *Krankel* claim by making "sarcastic remarks." As noted, we discuss the merits of the *Krankel* claim elsewhere in our analysis. However, we cannot find the trial court's comments were inappropriate, but instead merely pointed out that there may be less trial preparation required for a defendant who was not planning on testifying.

persuasive. First, merely tallying the number of motions and objections that were granted with respect to each of the parties does not provide an accurate measure of whether the trial court was acting inconsistently. Such a tally entirely omits the reasons for the objections and motions, which is critical in determining whether the trial court's actions were proper. Significantly, in the case at bar, defendant does not raise any claims on appeal that any of the trial court's evidentiary rulings were improper.

¶ 75        Furthermore, we cannot agree with defendant's characterization of the trial court's conduct as placing restrictions on APD Placek. We have discussed the objectionable conduct in detail above, and have no need to repeat it in our analysis. As we have explained, we agree that the trial court made improper comments during several of APD Placek's cross-examinations. However, we cannot agree with defendant that such comments operated as restrictions placed on the defense. Even though the trial court's comments went further than appropriate, all of the court's comments initially arose from legitimate issues within the scope of APD Placek's cross-examinations, such as irrelevant or argumentative questioning. Stopping such questioning was for the purpose of keeping the trial appropriately focused, and did not serve as such an improper restriction placed on the defense that deprived defendant of a fair trial.

¶ 76                                    B. Motion for Mistrial

¶ 77        Defendant next claims that he was deprived of a fair trial because the trial court should have granted his motion for a new trial or should have recused itself due to its bias against APD Placek. "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). A mistrial may be warranted "when the jury is apparently so influenced and prejudiced that it could not

have been fair and impartial, and the damage could not be cured by admonitions and instructions." *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 29 (citing *People v. Clark*, 231 Ill. App. 3d 571, 574-75 (1992)). "The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion." *Nelson*, 235 Ill. 2d at 435 (citing *People v. Bishop*, 218 Ill. 2d 232, 251 (2006)).

¶ 78    In the case at bar, defendant's motion for a mistrial was based entirely on the court's alleged bias against APD Placek, which we have discussed at length. Since we cannot find that the jury was prejudiced by any of the trial court's comments, we cannot find that the trial court abused its discretion in denying a mistrial on that basis.

¶ 79    Similarly, we do not find persuasive defendant's claim that the trial court abused its discretion in failing to recuse itself from the proceeding due to its bias against APD Placek. Our supreme court has instructed that "[w]hether a judge should recuse himself is a decision in Illinois that rests *exclusively within the determination of the individual judge*, pursuant to the canons of judicial ethics found in the Judicial Code." (Emphasis in original.) *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 45. As such, "[t]he Judicial Code, which is a part of [the supreme court] rules, says nothing that would give the impression that its provisions could be used by a party of his lawyer as a means to force a judge to recuse himself, once the judge does not do so on his own." *O'Brien*, 2011 IL 109039, ¶ 45. Consequently, this court will not disturb the trial judge's determination that it was not necessary for him to recuse himself from the instant case.

¶ 80                                    C. Right to Counsel

¶ 81    Finally, defendant claims that the trial court's prejudice against APD Placek prevented the defense from being able to fully present its case, depriving him of his right to effective

48

assistance of counsel. "Government violates the right to effective assistance [of counsel] when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). This includes, for instance, preventing counsel from presenting a closing argument before the factfinder. *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003).

¶ 82    In the case at bar, defendant contends that the trial court interfered with defendant's right to counsel "by curtailing Ms. Placek's ability to conduct witness examinations and make arguments." Again, we have discussed the comments that the trial court made during APD Placek's cross-examinations above and have no need to repeat our analysis here, other than to note that we cannot find that the trial court "played the role of prosecutor" or prevented her from examining the witnesses through its comments, as defendant claims. With respect to the defense's ability to make arguments, defendant claims that the court "permitted no argument from the defense" on a motion to dismiss the indictment, and "cut Ms. Placek's argument on her motion for mistrial short." Neither of these claims is an accurate reflection of the record.

¶ 83    With respect to the motion to dismiss the indictment, defendant is correct that there was no oral argument on the matter. However, before denying the motion, the court indicated that it had read the defense's motion, the transcripts of the grand jury proceedings, and the police reports, and that dismissal of the indictment was not supported by the evidence. Defendant cites no cases suggesting that a trial court is required to permit oral argument on such a motion, and we cannot find that the court's failure to do so deprived defendant of his right to counsel.

¶ 84    Similarly, defendant focuses only on the last comment made by the trial court during its ruling on the motion for mistrial: "I'm not going to waste my time listing [*sic*]." First, we must note that the parties have divergent interpretations of the meaning of this line, with defendant

claiming that the trial court was saying that it was "not going to waste [its] time [listening]," and the State claiming that the trial court was saying that it was "not going to waste [its] time listing [further reasons for denial]." As we are presented with only a cold record, we make no comment as to which interpretation best reflects the trial court's actual intention. However, even leaving that comment aside, the record makes clear that the court permitted APD Placek ample time to argue the motion. As noted, the motion for mistrial was based entirely on the trial court's purported bias against APD Placek. In arguing the motion, she pointed out a number of instances that she claimed demonstrated that bias, and the trial court addressed each of those instances in considerable depth. We cannot find that the trial court curtailed her argument in any way and, accordingly, cannot find that the trial court deprived defendant of his right to counsel.

¶ 85                                    II. Sufficiency of the Evidence

¶ 86        Next, defendant claims that the trial court erred in denying his motions for a directed verdict and for a new trial because the evidence was insufficient to establish his guilt. "A motion for a directed verdict asserts only that as a matter of law the evidence is insufficient to support a finding or verdict of guilty. The making of it requires the trial court to consider only whether a reasonable mind could fairly conclude the guilt of the accused beyond reasonable doubt, considering the evidence most strongly in the People's favor." *People v. Withers*, 87 Ill. 2d 224, 230 (1981); see also 725 ILCS 5/115-4(k) (West 2018) (a court may enter a directed verdict where "the evidence is insufficient to support a finding or verdict of guilty"). A motion for a directed verdict presents a question of law, which we review *de novo*. *People v. Kelley*, 338 Ill. App. 3d 273, 277 (2003). *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. McDonald*, 2016 IL 118882, ¶ 32.

50

¶ 87        As an initial matter, the State claims that defendant has forfeited this claim by failing to renew it after resting his case. "It is well settled that a defendant who chooses to present evidence after the denial of his motion for a directed verdict at the close of the State's case waives any error in the trial court's ruling on the motion unless he renews the motion at the close of all the evidence." *Kelley*, 338 Ill. App. 3d at 277 (citing *People v. DeBartolo*, 242 Ill. App. 3d 811, 816 (1993)). However, we cannot find that defendant forfeited his claim in the case at bar. At the close of the State's case, in order to avoid the jury having to leave the courtroom, the trial court expressly permitted defendant to present its evidence "without waiving anything." Later, outside the presence of the jury, after the defense had presented its witnesses, the court proceeded to hear defendant's motion for a directed verdict. The only evidence that was presented after that point was the defense entering a stipulation as to portions of Montano's grand jury testimony for purposes of impeachment. Given the timing of the argument on the defense's motion for a directed verdict, and the fact that the court expressly permitted the defense to raise the issue at a later point without waiving it, we cannot find that defendant was required to renew the motion almost immediately after it was denied in order to preserve it for appeal. Accordingly, we consider the merits of defendant's argument.

¶ 88        In the case at bar, defendant argues that the trial court should have entered a directed verdict because the only direct evidence of defendant's guilt was Montano's testimony, which was "improbable, unconvincing, and contrary to human experience." We do not find this argument persuasive. In determining whether a directed verdict is appropriate, "[t]he trial judge does not pass upon the weight of the evidence or the credibility of the witnesses in testing the sufficiency of the evidence to withstand a motion for a directed verdict." *People v. Connolly*, 322 Ill. App. 3d 905, 915 (2001). "In other words, a motion for a directed verdict of not guilty asks whether

51

the State's evidence *could support* a verdict of guilty beyond a reasonable doubt, not whether the evidence *does in fact support* that verdict." (Emphases in original.) *Connolly*, 322 Ill. App. 3d at 915. Defendant's argument here rests entirely on his claim that Montano's testimony was incredible. However, considering the evidence most strongly in the State's favor, a reasonable trier of fact could have found Montano's testimony credible, especially where there was substantial evidence that Montano knew defendant previously, Montano identified defendant as the shooter multiple times immediately after the shooting, there was video evidence of an altercation between Montano and defendant shortly before the shooting, and an uninterested witness observed a vehicle driving quickly away immediately after hearing the gunshot. We cannot find that Montano's testimony was so incredible that it was insufficient to support defendant's conviction as a matter of law.

¶ 89     Similarly, we cannot find that the trial court erred in denying defendant's motion for a new trial on the same basis. When an appellate court is asked to consider the sufficiency of the evidence after a trial, our function is not to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Instead, we determine whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Beauchamp*, 241 Ill. 2d at 8. In making this determination, we draw all reasonable inferences from the record in favor of the State, and will not reverse the defendant's conviction unless the evidence is " 'so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *Beauchamp*, 241 Ill. 2d at 8 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 90     As noted, our supreme court has consistently held that "the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is

contradicted by the defendant." *Harris*, 2018 IL 121932, ¶ 27 (citing *Gray*, 2017 IL 120958, ¶ 36). In the case at bar, we cannot find that Montano's testimony was so incredible that a jury could not have believed it. Aspects of Montano's testimony were corroborated by other evidence, such as video evidence and the testimony by Galvez that defendant went to the dry cleaner and the altercation between defendant and Montano in the Jewel parking lot. Montano's history with defendant was also corroborated, with photos of defendant that were found on Montano's cell phone and with the police report filed after their altercation in 2015. The defense also presented witnesses that corroborated parts of Montano's testimony, as both Maslona and Zavala testified that Montano rushed into a nearby home shortly after the shooting before coming back out, and Maslona testified that he observed a vehicle speeding away from the scene immediately after the shooting. While defendant points out discrepancies or flaws in Montano's testimony, nothing defendant points to renders the evidence so improbable that a reasonable jury could not have found defendant guilty beyond a reasonable doubt. "[E]ven contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all, [he] testified truthfully." *Gray*, 2017 IL 120958, ¶ 47. Accordingly, we cannot find that the trial court erred in denying either defendant's motion for a directed verdict or his motion for a new trial.

¶ 91                                III. *Krankel* Hearing

¶ 92       Defendant next claims that the trial court erred in denying him a full *Krankel* hearing to address his claims of ineffective assistance of counsel. Through *People v. Krankel* and its progeny, the Illinois Supreme Court has provided our trial courts with a clear blueprint for the handling of posttrial *pro se* claims of ineffective assistance of counsel. *People v. Moore*, 207

Ill. 2d 68, 77-82 (2003) (discussing *Krankel* and its progeny); *People v. Chapman*, 194 Ill. 2d 186, 227-31 (2000) (same); *People v. Johnson*, 159 Ill. 2d 97, 124 (1994) (same). A trial court is not automatically required to appoint new counsel any time a defendant claims ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77. Instead, the trial court must first conduct an inquiry to examine the factual basis underlying a defendant's claim. *Moore*, 207 Ill. 2d at 77-78.

¶ 93     A trial court may base its *Krankel* decision on: (1) the trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant"; or (3) "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. "If [a] trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Moore*, 207 Ill. 2d at 78. A claim may lack merit if it is " 'conclusory, misleading, or legally immaterial' or do[es] 'not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. Burks*, 343 Ill. App. 3d 765, 775 (2003) (quoting *Johnson*, 159 Ill. 2d at 126)). However, the determination of whether a claim lacks merit requires a "case-by-case, fact-specific examination, driven by the record." *People v. Roddis*, 2020 IL 124352, ¶ 64.

¶ 94     If an examination of the defendant's claims "indicate that trial counsel neglected defendant's case," the trial court must appoint new counsel. *People v. Ramey*, 152 Ill. 2d 41, 52 (1992). The claim then proceeds to "the second stage of the *Krankel* proceeding" (*People v. Jolly*, 2014 IL 117142, ¶ 44), when defendant is represented by new counsel at an "evidentiary hearing" (*Jolly*, 2014 IL 117142, ¶¶ 43-44). See also *Moore*, 207 Ill. 2d at 78 ("The new counsel would then represent the defendant at the hearing on the defendant's *pro*

*se* claim of ineffective assistance."). "The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to defendant's position." *Moore*, 207 Ill. 2d at 78.

¶ 95    We review *de novo* whether the trial court properly conducted the *Krankel* inquiry. *Jolly*, 2014 IL 117142, ¶ 28. As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. If, however, the trial court has properly conducted the *Krankel* inquiry and reached a determination on the merits, we will reverse only if the trial court's action was manifestly erroneous. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 96    In the case at bar, defendant contends that the trial court did not properly conduct the *Krankel* inquiry because it "permitted the preliminary *Krankel* inquiry to become adversarial" and relied on evidence outside the record. With respect to the first claim, defendant argues that, where there was a conflict between defense counsel's version of events and defendant's, the trial court should have held a full hearing with new counsel and its decision to credit defense counsel's statements turned the process into an adversarial one. We do not find this argument persuasive.

¶ 97    First, we cannot find that the process became adversarial merely because defense counsel was permitted to address defendant's claims, even if defendant disagreed with what they were saying. It is not unusual for defense counsel to address such claims in the context of a preliminary *Krankel* inquiry, such as occurred in the case at bar. Indeed, our supreme court has

noted that, during the preliminary *Krankel* inquiry, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. In doing so, trial counsel may answer questions and explain the facts and circumstances surrounding the defendant's allegations. *Moore*, 207 Ill. 2d at 78. This is exactly what occurred in the case at bar. The trial court asked defendant to explain why he believed counsel was ineffective, then asked counsel to address the facts and circumstances surrounding defendant's claims.

¶ 98    Additionally, despite defendant's claims, the trial court's denial of his *Krankel* motion was not simply a matter of the trial court crediting defense counsel's version of events over defendant's version. Instead, the court relied heavily on defendant's own statements before the court, noting several times that defendant admitted to the court that he had never informed his counsel of his claim that he was at Lozano's house at the time of the shooting. It is true that the trial court apparently did not believe defendant's claim that he informed counsel of his witnesses' last names, but whether defendant informed counsel of their last names is largely irrelevant, as counsel informed the court that they were able to make contact with Lozano, who indicated that he was not willing to testify. Thus, we cannot find that the trial court's preliminary *Krankel* inquiry became inappropriately "adversarial."

¶ 99    Similarly, we do not find persuasive defendant's claim that the trial court relied on evidence outside the record in denying a full *Krankel* hearing. Specifically, defendant claims that the trial court relied on "personal speculations" to justify denying a full hearing. First, defendant claims that the trial court "relied on the unsupported 'fact' that [defendant] said he never told his attorneys he had an alibi." Defendant claims that "the record does not support this claim."

However, defendant is simply incorrect. When the trial court initially asked defendant about the basis for his ineffectiveness claim, defendant told the court that "the basic [issue] was my alibi witnesses were never interviewed, so they were never contacted." The trial court then discussed the specifics of defendant's alibi with defendant. The court then asked defendant:

"THE COURT: Who is the first person that you told that you were at David Lozano's house at the time of the offense?

DEFENDANT: I don't recall anybody.

THE COURT: You never told anybody?

DEFENDANT: I mean I'm trying to get affidavits from them so that way they could...

THE COURT: You're telling me you never told your attorneys that you were at Lozano's house at the time—

DEFENDANT: My attorney never came to visit me. [APD Placek] never came to visit me.

THE COURT: And since 2016, [defendant], what you just told me is that it never crossed your mind to tell any of your attorneys that you were somewhere else when the shooting took place? All right."

¶ 100    Later, the court further questioned defendant about his claims that his counsel had not prepared him for trial:

"THE COURT: If she had spent more time with you at Cook County Jail, what would have been different?

DEFENDANT: I would have gave [*sic*] her my whole output on the whole case as far as the witnesses, my side of the story.

THE COURT: What is your side of the story?

DEFENDANT: There's a lot to it.

\* \* \*

THE COURT: You never told your attorneys your side of the story?

DEFENDANT: Because they never came to visit."

¶ 101       Thus, on two separate occasions, defendant informed the trial court that he had not given his counsel his "side of the story," once specifically telling the court that he could not recall ever telling anyone about his claim that he was at Lozano's house at the time of the shooting. While defendant later denied ever informing his attorneys that he was at the scene of the shooting, as they claimed, defendant never contradicted the court's comments expressing its understanding that defendant never informed anyone that he was at Lozano's house. At most, defendant stated that he "said from the beginning that I always had an alibi." Accordingly, we find no error in the trial court's partially relying on defendant's statements in denying a full *Krankel* hearing.

¶ 102       We also cannot find that the trial court relied on speculation as to defendant's refusal to provide his witnesses' last names to his attorneys. It is true that the trial court commented that it would have made sense if defendant had withheld the last names in order to protect his friends. However, examining the trial court's comments in context, it is clear that the trial court did not rely on speculation in denying defendant's motion. Again, as noted, the trial court relied heavily on defendant's own comments that he had not informed counsel of his alibi. Additionally, the court found that counsel did investigate, attempting to locate defendant's witnesses "to determine whether or not they could in any way be beneficial to [defendant]," and discovering uncooperative individuals. The trial court's comments as to whether defendant

58

was attempting to shield his friends from possible liability were thus ancillary to its ultimate determination that counsel had acted reasonably in investigating defendant's claims. Accordingly, we cannot find that the trial court relied on improper speculation in denying defendant a full *Krankel* hearing.

¶ 103                           IV. One-Act, One-Crime Doctrine

¶ 104       Finally, defendant claims that the trial court violated the one-act, one-crime doctrine in sentencing him for both first-degree murder and attempted murder. Under the one-act, one-crime doctrine, multiple convictions are improper if they resulted from the same act. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 236. Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *Burgess*, 2015 IL App (1st) 130657, ¶ 235. As noted, *de novo* consideration means we perform the same analysis that a trial judge would perform. *McDonald*, 2016 IL 118882, ¶ 32.

¶ 105       In the case at bar, there is no dispute that both the conviction for the victim's murder and the conviction for the attempted murder of Montano arose from the same single gunshot, which the jury found was fired by defendant. There also appears to be no dispute that the single gunshot could properly have served as the basis for finding defendant guilty of *either* the victim's murder *or* the attempted murder of Montano. The question we must answer is whether that single gunshot could have served as the basis for finding defendant guilty of *both* the victim's murder *and* the attempted murder of Montano. In other words, does the fact that there were two victims take the single act out from under the one-act, one-crime analysis? Under the facts of the case at bar, we must find that it does.

¶ 106       The State claims that this is a simple case, because separate victims require separate convictions and sentences, and points to several cases in support of its claim. See, *e.g.*, *People*

*v. Shum*, 117 Ill. 2d 317, 363 (1987) ("In Illinois it is well settled that separate victims require separate convictions and sentences."). However, this case does not present that simple of a situation. We find the discussion of this issue in *People v. Hardin*, 2012 IL App (1st) 100682, ¶¶ 30-35, to be instructive. After examining a number of cases, the *Hardin* court explained that courts that have upheld multiple convictions involving separate victims for a single act have done so "where the criminal act was statutorily defined as being directed at a person and the single act was directed at multiple people." *Hardin*, 2012 IL App (1st) 100682, ¶ 32. Thus, where a defendant fired his gun in the direction of multiple people, he could be convicted of both second-degree murder and aggravated discharge of a firearm, because the criminal act was committed against multiple victims. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 33. By contrast, where a defendant fired his gun at a vehicle in which two police officers were sitting, only one conviction for discharging a firearm in the direction of a vehicle known to be occupied by a peace officer was proper, because the statute defined the criminal act as being directed at the vehicle, not the individuals inside the vehicle. *Hardin*, 2012 IL App (1st) 100682, ¶ 31.

¶ 107    In the case at bar, defendant was convicted of first-degree murder and attempted first-degree murder. A person commits first-degree murder "if, in performing the acts which cause the death: (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2014). Attempt crimes require proof that the defendant, "with intent to commit a specific offense, *** does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2014). Thus, the offense of attempted murder requires the mental state of specific intent to commit murder. *People v. Stokes*, 293 Ill. App. 3d 643, 650

(1997). Since both of the criminal acts are defined as being directed at a person, convictions for both were appropriate, despite the fact that there was only a single gunshot.

¶ 108    The cases cited by defendant do not suggest otherwise. Defendant places heavy reliance on *People v. Burrage*, 269 Ill. App. 3d 67 (1994), which he claims is "on all fours" with the case at bar. However, we cannot find that case to be at all applicable to our analysis. In *Burrage*, the defendants shot at an individual, but the shots missed and instead hit a building, passing through the wall and striking a child sitting on his couch. *Burrage*, 269 Ill. App. 3d at 70. The defendants were convicted of both attempted first-degree murder and armed violence. *Burrage*, 269 Ill. App. 3d at 69. On appeal, the appellate court found that the evidence was sufficient to establish the element of intent for the attempted first-degree murder convictions, because the intent to kill transferred from the intended victim to the child under the doctrine of transferred intent. *Burrage*, 269 Ill. App. 3d at 76. However, the appellate court also found that the defendants could not be convicted of both attempted first-degree murder and armed violence, because they were based on the same physical act. *Burrage*, 269 Ill. App. 3d at 73, 77.

¶ 109    The only similarity that *Burrage* has to the case at bar is defendant's claim that that Montano, not the victim, was the intended target of the shooting. However, even if true, this fact does not mean that *Burrage* provides any guidance to our one-act, one-crime analysis. Both convictions at issue in *Burrage* involved the same victim, unlike the case at bar. Thus, *Burrage* does not speak in any way to the issue of whether a single act directed at multiple victims can serve as the basis for multiple convictions. The same is true of the other cases cited by defendant, none of which speaks to the question at issue in the case at bar. See, *e.g.*, *People v. Aikens*, 2016 IL App (1st) 133578, ¶¶ 42-43 (where defendant fired at two police officers, vacating most of his convictions on one-act, one-crime grounds, but affirming two convictions

for attempted murder); *People v. Scott*, 2015 IL App (1st) 133180, ¶¶ 21-22 (vacating multiple convictions concerning a single victim on one-act, one-crime grounds); *People v. Tabb*, 374 Ill. App. 3d 680, (2007) (same); *People v. King*, 66 Ill. 2d 551, 566 (1977) (affirming multiple convictions for separate acts concerning a single victim).

¶ 110     We are similarly unpersuaded by defendant's contention that only one conviction can stand because attempted murder is a lesser included offense of first-degree murder. Defendant cites no cases or other legal authority supporting his claim that a crime involving one victim can be considered a lesser included offense of a crime involving a different victim. In the absence of such authority, we cannot find that the attempted murder of Montano is a lesser included offense of the first-degree murder of the victim. Consequently, both convictions were valid, and the trial court properly sentenced defendant for both.

¶ 111                              CONCLUSION

¶ 112     For the reasons set forth above, we affirm defendant's conviction. First, while several of the trial court's comments were improper, the trial court did not demonstrate bias against the defense such that it prejudiced the jury or required a new trial. Second, the trial court properly denied defendant's motions for a directed verdict and a new trial, where the evidence was sufficient to support his conviction. Third, the trial court did not err by denying defendant a full *Krankel* hearing. Fourth, although the defendant's convictions were based on the same physical act, they involved different victims, so the one-act, one-crime doctrine does not operate to bar both convictions.

¶ 113     Affirmed.